# Exhibit A

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| ALPHA ENERGY, a division of ALPHA TECHNOLOGIES SERVICES, INC. ) ) | ) ) | SX-17-CV-015 |
| Plaintiff | ) | |
| v. | ) ) | COMPLAINT FOR BREACH OF CONTRACT, |
| GEC, LLC, and CONTINENTAL CASUALTY COMPANY | ) ) ) | UNJUST ENRICHMENT, AND CLAIM AGAINST PAYMENT BOND |
| Defendants | ) ) | |
| GEC, LLC, | ) ) | |
| Plaintiff | ) ) | SX-18-CV-058 |
| v. | ) ) | |
| ARGONAUT INSURANCE COMPANY | ) ) ) ) | CLAIM AGAINST PERFORMANCE BOND |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

**DECLARATION OF JOHN R. WESSEL**

I, John R. Wessel, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an adult resident of St. Croix, U.S. Virgin Islands and make this declaration upon personal knowledge of facts stated in support of GEC's Counterstatement of Facts ("CSOF") in opposition to Alpha's Motion for Summary Judgment and in opposition to Argonaut's Motion for Summary Judgment.

2. I am the Managing Member and Chief Executive Officer of GEC, LLC ("GEC").

3. On or about December 31, 2014 GEC and JDC Anna's Hope Associates, LLLP ("JDC") executed a "General Contract" for the construction of a project denominated "Anna's Hope Affordable Housing Apartments" (the "Anna's Hope Project"). The General Contract was executed on standard AIA forms. AIA Document A101 – 2007, with

Exhibit C thereto (the Liquidated Damages Schedule), is attached to the CSOF as Exhibit B.[1]

4. Pursuant to the General Contract as first executed, the date for Substantial Completion was July 13, 2016.

5. On or about April 22, 2015, GEC and JDC executed Change Order No. 1 to the General Contract ("GC CO-1") for the purpose, *inter alia*, of adding to GEC's Scope of Work "procuring, coordinating and timely installing a micro grid electrical generation system to the Project (the "Micro Grid System") as designed by Alpha Energy, LLC ('Alpha"). A complete copy of GC CO-1 is attached to the CSOF as Exhibit C.

6. Although JDC's signature on GC CO-1 is dated 4/16/17, it was in fact executed by JDC on or before April 22, 2015, as demonstrated by its email transmittal to GEC from JDC on April 22, 2015. A copy of the email transmittal with the executed GC CO-1 is attached to the CSOF as Exhibit D. JDC's signature thereon was merely misdated.

7. On or about July 8, 2016, GEC and JDC executed Change Order No. 3 to the General Contract ("GC CO-3"). GC CO-3, inter alia, extended the date of Substantial Completion to September 30, 2016. A complete copy of GC CO-3, including the revised Liquidated Damages Schedule, is attached to the CSOF as Exhibit E.

8. On or about July 7, 2015, GEC and Alpha entered into a Purchase Order Subcontract Agreement (the "Subcontract") whereby Alpha agreed to "design, engineer, procure, supply and install" all of the Work subsumed in GC CO-1 (i.e., the Microgrid). The Subcontract was modified on or about October 19, 2015, by the execution of Change Order No. 1 to the Subcontract "(Subcontract CO-1"). A complete copy of the Subcontract, as modified by Subcontract CO-1, is attached to the CSOF as Exhibit F.

9. Beginning in early February of 2015, prior to the execution of GC CO-1 and the execution of the Subcontract, I had email and telephone communications with Alpha representatives Mr. Tom Bowker (a sales representative) and Mr. Axel Schmidt (an Alpha design engineer) for the purpose of obtaining a bid proposal from Alpha for the design, engineering, procurement, supply, and installation of a microgrid for the Anna's Hope Project that would reliably provide 100% of its electrical power. Ultimately, the bid proposal was presented to both JDC and GEC on February 17,

---

[1] Exhibit B does not include all of the documents of the General Contract insofar as the complete General Contract documents are comprised of hundreds of pages. Alpha is in possession of the complete General Contract and all Change Orders thereto.

2015, via email from Mr. Bowker. A copy of the email string and its attachment (i.e., the "Alpha Proposal") is attached to the CSOF as Exhibit G.

10. The Alpha Proposal includes a great many representations concerning the reliability of Alpha's design for the Microgrid and Alpha's experience and expertise in providing a reliable Microgrid for the Anna's Hope Project on a turnkey basis. I relied upon such representations in agreeing to GC CO-1 and the Subcontract as modified.

11. Both prior to and subsequent to the submission of the Alpha Proposal and prior to the execution of GC CO-1 and the Subcontract as modified, Mr. Bowker and Mr. Schmidt assured me that Alpha had the necessary experience and expertise to design, procure, supply, and install a reliable Microgrid that would reliably provide 100% of the electrical power to the Anna's Hope Project. I relied upon those representations in agreeing to GC CO-1 and the Subcontract as modified.

12. The Subcontract as amended contains numerous representations and warranties concerning Alpha's experience and expertise in providing a reliable Microgrid for the Anna's Hope Project on a turnkey basis. I relied upon such representations and warranties in agreeing to the Subcontract as modified.

13. In fact, according to the testimony of the Alpha design engineers, prior to the execution of the Subcontract Alpha had never designed, engineered, procured, supplied and installed any independent Microgrid for any commercial multi-family residential project. Based upon discovery to date, and as more fully set forth in the CSOF, the Microgrid for the Anna's Hope Project is the only such microgrid Alpha has every attempted.[2] Had I known that Alpha had zero experience and expertise in providing a microgrid for a commercial multi-family residential project GEC would not have agreed to GC CO-1 and would not have entered into a Subcontract with Alpha.

14. Alpha's own microgrid expert, Michael Vance, testified that in 2015 and 2016 "dating back to that time period, there were few if any of those projects existing in the world. So finding an EPC who had experience doing a microgrid project for a residential neighborhood like that would have been nearly impossible."[3] Had I known that the state of the art in 2015 for such a residential microgrid was in its infancy as stated by Mr. Vance, GEC would not have agreed to GC CO-1 and would not have entered into a Subcontract with Alpha.

---

[2] Deposition of Jesse Krause, Exhibit HH to CSOF, [32:4]-[32:20], [146:19]-[147:23]; Deposition of Axel Schmidt, Exhibit II to CSOF, [43:21]-[45:9], [86:5]-[89:6].
[3] Deposition of Michael Vance, Exhibit LL to CSOF, [59:20]-[62:22].

15. Among the many deficiencies in Alpha's experience and expertise, as shown by their testimony, was a complete lack of familiarity with the Clean Air Act and EPA requirements for operating the non-emergency stationary diesel generators integral to the Microgrid.[4] Had I known that Alpha lacked any knowledge or expertise on the subject of legally permitting and operating an independent power system under federal law GEC would not have agreed to GC CO-1 and would not have entered into a Subcontract with Alpha.

16. The Subcontract as modified includes, *inter alia*, the following provisions:

- Except as modified by this Subcontract, Subcontractor agrees to adhere to and be bound to the Contractor by all of the provisions of the General Contract between the Contractor (or its affiliate) and the Owner and to the contract documents therein affecting subcontractor's work hereunder, and, insofar as its work is concerned, the Subcontractor assumes towards the Contractor, or its affiliate, all or the duties, obligations and liabilities that the Contractor assumes toward the Owner.

- Scope of Work: The Subcontractor will design. engineer, procure. supply and install all of the work required of Alpha under Exhibit A directly or through suppliers and subcontractors approved by the Contractor. The Scope of Work includes all design, engineering, procurement, coordination, supervision, labor, tools, equipment, and materials to complete installation of this Micro Grid System. As a part of such performance the Subcontractor will timely provide all documentation required of Alpha and its constituents by Exhibit 1 to said change order during the shop drawing submittal process contemplated by Exhibit 1 and in this connection it shall provide written start up, commissioning, and long term operating performance standards for the Micro Grid system that are satisfactory to the Owner for the purposes of measuring the efficacy of the Micro Grid System after the physical installation of the Micro System under this Subcontract, satisfactory compliance with which shall be the exclusive responsibility of the Owner and the Subcontractor.

---

[4] See, generally, GEC's Motion for Partial Summary Judgment, Doc. Nos. 159, 160, and 165; Deposition of Danny Alldredge, Exhibit FF to CSOF, [102:22]-[104:6]; Deposition of Jesse Krause [68:13]-[69:3]; Deposition of Axel Schmidt [30:11]-[40:11]; Deposition of Leonard Vega, Exhibit GG to CSOF, [127:25]-[129:4].

- All such Work shall further meet the requirements of applicable licenses, and Territorial and federal regulatory requirements. Such Work shall be performed in a skillful and competent manner in accordance with the highest standards or the Subcontractor's profession.

- ALPHA ENERGY hereby warrants that it and its agents and sub-contractors have the necessary expertise and technical and legal expertise to perform the work under the contract plans and specifications and all applicable laws, rules and regulations of the United States and the United State Virgin Islands concerning the work/materials furnished hereby, …. Supplier/Subcontractor further acknowledges that in entering into this agreement GEC is relying on such expertise, knowledge and compliance by the Supplier/Subcontractor in the performance or the work or furnishing of the materials and agrees to defend and hold harmless GEC from or on account or any debts, claims, demands. suit and/or liabilities arising from or in connection with any violation by Supplier of such laws, rules or regulations.

- 2. Subcontractor and/or Supplier agrees to be bound to the Contractor by the terms of the Contract between Contractor and the Owner referred to on the front of this Agreement and Contract Documents thereof, and to assume towards Contractor all the obligations and responsibility that Contractor by said documents assumes toward the Owner provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision of this Agreement, this Agreement shall govern.

- 7. Subcontractor and/or Supplier hereby guarantees the good quality of the workmanship and materials being supplied by it under this Agreement, and if any defect therein appears within one (1) year after issuance of the Certificate of Substantial Completion, or longer if required by the contract between Contractor and Owner, because of faulty workmanship or materials supplied under this Agreement. [sic] Subcontractor and/or Supplier will replace or repair such faulty workmanship or materials without additional charge to Contractor. If required, Subcontractor and/or Supplier shall tarnish [sic] with his final billing a bank guaranty (or surety or warranty bond in lieu thereof if acceptable to Contractor and Owner) in form and substance satisfactory to Contractor in the percentage of the Adjusted Contract Price set forth on the front of this Agreement.

- 16. Subcontractor and/or Supplier shall cooperate with Contractor and other Subcontractor's in the scheduling and performance of its Work. It shall

commence its work upon notification from Contractor and will proceed towards completion in accordance with the schedule established by Contractor. **If Subcontractor fails to pursue or complete his work in accordance with the schedule established by Contractor it hereby agrees to indemnify and hold harmless Contractor for any loss or damage caused by such delay**. (Emphasis supplied.)

- 23. In addition to all other rights or remedies which the Contractor may have at law or in equity, the contractor reserves the right to terminate this Agreement in whole or in part after giving (3) days written notice to the Subcontractor and/or Supplier without cost or expense to the Contractor. In the event of the happening of any of the following which shall be deemed occasions of default by the Subcontractor and/or Supplier, failure to perform the Work in accordance with the completion date or dates specified in the Agreement; failure in any respect to prosecute the work with promptness and diligence, breach of any of the warranties contained herein, failure to pay promptly for labor materials, machinery, equipment, tools, plants, facilities, work services or any of its other obligations, interference with the work of others or causing stoppages or delays, insolvency; the execution of an assignment for the benefit of credits, [sic] the filling [sic] of proceedings in bankruptcy or for corporate reorganization or arrangement by or against the Subcontractor and/or Supplier of failure to strictly comply with the terms and Conditions of this Agreement. In the event of such termination by the Contractor. Contractor may provide through itself or through others any labor, materials, equipment, machinery tools, plants, facilities, work and services for the performance of the Work and completion of the Agreement, and deduct the cost and expense thereof from any money due or thereafter to become due to the Subcontractor and/or Supplier. **Should the Contractor terminate this Agreement, the Subcontractor and/or Supplier shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly finished at which time, if the unpaid balance of the amount due the Subcontractor and/or Supplier shall exceed the cost and expense incurred by the Contractor in completing this Agreement, such excess shall be paid by the Contractor to the Subcontractor and/or Supplier, but if such costs and expenses shall exceed such unpaid balance, the Subcontractor and/or Supplier shall pay the difference to the Contractor. The cost and expense incurred by the Contractor shall include all costs of completing the Work, all payments for labor, materials, equipment, machinery, tools, plant facilities, services, all other obligations of the Subcontractor and/or Supplier incurred by the Subcontractor and/or Supplier and paid directly by the Contractor any damages incurred through the default of the Subcontractor and/or Supplier,**

> **and also any other costs or expenses incurred by the Contractor, including reasonable attorney's fees.** (Emphasis supplied.)

17. Contrary to Alpha's Motion for Summary Judgment, the payment terms of the Subcontract as modified are as follows:

    Payment Terms:

    1. 10% .... To be included in GEC Pay Estimate # 3 to Owner on 5-8-15 (or the next Pay Estimate from GEC to Owner occurring after execution of this agreement) and paid to Alpha Energy when received within 15 days or so thereafter.
    2. 10% .... At Design Sign off which shall be defined as Alpha Energy's Submittal package being approved by the Architect and Electrical Engineer. This approved Submittal is a Contract requirement. GEC will incorporate this 10% payment in the next pay estimate after design approval and pay Alpha on receipt of payment from the Owner.
    3. 30% .... When materials are on site and GEC has incorporated them as Stored Materials in GEC's pay estimate to the Owner and received payment from Owner.
    4. 40% .... Progress payments as percentage of installation complete during installation and commissioning period, when paid by Owner to GEC.
    5. 10% .... Upon Commissioning of the Micro Grid System.

    Retainage to be withheld from each of the Payment Items above and released to Alpha at the end of the job as required by GEC's Contract with the Owner, and paid to Alpha when paid by the Owner to GEC.

18. GEC paid Alpha's Pay Estimate 1 ("PE-1") as timely submitted and approved.

19. The second payment to Alpha was upon "Design Sign off" which is defined as "Alpha Energy's Submittal package being approved by the Architect and Electrical Engineer." Alpha provided an initial "Submittal package" to GEC on or about August 21, 2015. The initial package was unsatisfactory and a revised package was submitted on or about September 11, 2015, which was forwarded to the Architect and Electrical Engineer of record. A copy of the revised submittal package (excerpted for brevity by removal of the appendices) is attached to the CSOF as Exhibit H.

20. Contrary to the allegations of ¶ 14 of the Complaint, Alpha's submittals never received final approval by the Electrical Engineer of record. Rather, on or about

    October 6, 2015, they were merely "approved as noted" with a "Submittal Comment Sheet" from the Electrical Engineer of record requiring additional action items from Alpha. A copy of the "approval as noted" and the "Submittal Comment Sheet" is attached to the CSOF as Exhibit I. Alpha never responded to the action items required by the Electrical Engineer of record.

21. One of the open action items noted by the Electrical Engineer of record was a requirement for Alpha to confirm that a Tier 3 diesel generator was compliant.[5] The Electrical Engineer of record never approved a Tier 3 generator for this microgrid. In fact, the generator set for the Microgrid is required to be Tier 4 compliant.[6]

22. GEC achieved Substantial Completion of the Anna's Hope Project on or before September 30, 2016, with the sole exception of the microgrid that Alpha contracted to complete, and which has not been completed to date. Alpha has been in material breach of the Subcontract since no later than September 30, 2016.

23. Notwithstanding the lack of final approval of Alpha's submittals, and notwithstanding Alpha's material breach of the Subcontract for failure to achieve timely Substantial Completion, after a prolonged discussion and exchange of correspondence on the subject, Alpha submitted a revised PE-2 for the second milestone payment on or about October 12, 2016, which is attached to the CSOF as Exhibit J. This revised PE-2 was promptly paid on or about October 13, 2016. Payment of PE-2 was also predicated on Alpha's continued promises to promptly remobilize to expeditiously complete and commission the Microgrid.

24. As noted in ¶ 7, above, GEC was obligated to JDC to achieve Substantial Completion of the Anna's Hope Project on or before September 30, 2016. The General Contract, as amended by GC CO-1 and GC CO-3, requires as a condition of avoiding Liquidated Damages that GEC deliver all of the buildings to JDC no later than the required Substantial Completion date (i.e., September 30, 2016), including all utilities (in this instance a working microgrid as required by GC CO-1). Specifically, Exhibit C to the General Contract and Exhibit C to GC CO-3 both state:

> 1) General Contractor is responsible for providing roads, parking, water, sewer, **and utility service to the individual buildings**, as well as obtaining signed Certificates of Occupancy, on the above schedule in order to avoid payment of liquidated damages. (Emphasis supplied.)

---

[5] CSOF, Exhibit I, ERS comments, p. 4.
[6] See, generally, GEC's Motion for Partial Summary Judgment, Doc. Nos. 159, 160, and 165.

To date, the required utility service has not been delivered to the individual buildings due to Alpha's failure to complete and commission a working microgrid conforming to the requirements of GC CO-1 and all Liquidated Damages under the General Contract are computed at $500.00 per day of delay per apartment and Community Center. With 38 apartments and the Community Center not being connected to the required electrical utility service, GEC was exposed to a claim by the Owner of Liquidated Damages of $19,500.00 per day. JDC has never waived assessment of Liquidated Damages.

25. During the construction phase of the Anna's Hope Project GEC provided electrical power to the project from VIWAPA. Because of Alpha's failure to complete the Microgrid by the required date for Substantial Completion, and in order to forestall a claim for Liquidated Damages, and to mitigate damages to GEC and ultimately Alpha, GEC obtained and installed a permanent utility connection to VIWAPA and continued to pay for electrical service to the project after the date of Substantial Completion (i.e., after September 30, 2016).

26. Under GC CO-1, GEC was directly obligated to the Owner to obtain all necessary permits for installation and operation of the Microgrid. Specifically, GC CO-1 includes the following provision:

    4. Contractor shall have the sole responsibility for obtaining all building, environmental and land use permits that may be required by the V.I. Department of Planning and Natural Resources for the installation and operation of the Micro Grid System.

    To date the diesel generator sets supplied by Alpha for the Microgrid are not properly permitted for non-emergency use as required by the applicable statutes and EPA rules and regulations promulgated under the Clean Air Act.[7]

27. During the course of construction of the Anna's Hope Project, due to Alpha's failure to perform, GEC was required to self-perform a number of items that were within Alpha's Scope of Work for which GEC is entitled to back-charge Alpha or to be reimbursed by Alpha. Such items include, without limitation:

---

[7] See, generally, GEC's Motion for Partial Summary Judgment, Doc. Nos. 159, 160, and 165.

- Installation of all in-wall and underground conduits for all AC and DC wiring for the Microgrid.[8]
- Ocean freight, receipt, customs clearance, storage, transportation and material handling of Alpha materials.[9]
- Completion of roof racking to meet Virgin Islands Building Code requirements.[10]
- Permitting fees for generator.[11]

The amounts of such back-charges and/or reimbursements are disputed.

28. In the course of installing roof racking for the PV array Alpha or its subcontractors damaged roof membranes which GEC was required to repair in order to meet roof warranty requirements to the Owner. These repair costs are legitimate back-charges to Alpha. Reimbursement from Alpha for these repairs is disputed as to both liability and amount.

29. Notwithstanding Alpha's default in failing to meet the contractual deadline for Substantial Completion, GEC continued to work with Alpha in the anticipation and expectation that Alpha would expeditiously complete and commission the Microgrid to the satisfaction of JDC as required by the Subcontract as modified. Alpha continued to represent to GEC that completion and commissioning of the Microgrid was imminent. During this period GEC continued to incur general conditions costs that would not have been incurred absent Alpha's failure to complete the Microgrid as required by the Subcontract as amended. GEC claims these costs against Alpha. These claims are disputed both as to liability and amount.

30. Despite Alpha's continued representations to the contrary, Alpha's progress in completing the Microgrid was unsatisfactory. Other than vague promises of imminent completion, startup and commissioning, Alpha did not inform GEC of any problems in Microgrid operation nor did Alpha explain extended delays in attempting to power the Anna's Hope Project using the Microgrid.

31. In late October of 2015, in anticipation of Alpha's promised remobilization and expeditious completion of the Subcontract, I contemplated partial payments to Alpha for milestones 3 (materials) and 4 (installation). However, Alpha's performance

---

[8] § 3.3 of Exhibit 1 to GC CO-1.
[9] Deposition of Danny Alldredge [58:22]–[59:15] and [59:25]-[62:22].
[10] § 3.3 of Exhibit 1 to GC CO-1.
[11] Deposition of Danny Alldredge [59:25]-[62:22].

remained unsatisfactory. During this same time frame, JDC informed GEC that Alpha's failure to complete and commission the Microgrid to provide power to the Anna's Hope Project as a permanent independent power source threatened the loss of energy tax credit capital financing and exposed GEC to a claim for Liquidated Damages under the General Contract and GC CO-3. I communicated these concerns to Alpha in the strongest terms by email of November 21, 2016, a copy of which is attached to the CSOF as Exhibit K.

32. On December 21, 2016 I was assured via email by Mr. Leonard Vega (Alpha Director of Operations and Project Management) that "[t]he system is operating as designed and will be ready to turn over to you very soon." Mr. Vega informed me of Alpha's intention to send out the final pay estimate (which was for final commissioning – see ¶ 17, above) at the end of that week. However, at this point in time Alpha had never even attempted to power the Anna's Hope Project using the Microgrid. A copy of Mr. Vega's email is attached as Exhibit L to the CSOF.

33. Alpha did, in fact, submit PE-5 to GEC on or about December 23, 2016, claiming full completion and commissioning, despite the fact that as of that date Alpha had never once attempted to power the Anna's Hope Project using the Microgrid. A copy of Alpha's PE-5 is attached as Exhibit M to the CSOF.

34. In point of fact it would have been impossible to have "turned over" the Microgrid to the Owner in December of 2016, even had it been connected and working, because Alpha did not obtain a permit to operate the non-emergency stationary generator sets integral to the Microgrid until April 12, 2017. Copies of the initial generator permits obtained by Alpha are attached as Exhibit N to the CSOF.

35. Upon issuance of the generator operating permits, it became known to GEC that the Microgrid required EPA Tier 4 stationary engines meeting exhaust emissions standards of no more than 0.4 NOx g/KWh and of no more than 0.02 PM g/KWh, whereas Alpha had provided EPA Tier 3 generator engines. Thus, operation of the Microgrid by the Owner would be illegal under federal law.[12]

36. Attached as Exhibit O to the CSOF is a record in graphic form of all times in which Alpha attempted to power the Anna's Hope Project using the Microgrid. Alpha did not even attempt to do so until March 28, 2017, nearly six months after Alpha had failed to achieve Substantial Completion of its Work. On that day the Microgrid almost immediately suffered a system failure and had to be taken off line and the

---

[12] See, generally, GEC's Motion for Partial Summary Judgment, Doc. Nos. 159, 160, and 165.

Anna's Hope Project reconnected to WAPA. Since that time Alpha has never succeeded in producing a Microgrid that is capable of operating continuously more than 14 days, even though the Subcontract, as amended, requires a Microgrid that will power the Anna's Hope Project continuously completely independent of the local utility grid (i.e., WAPA) 24 hours a day, seven days a week, 365 days a year.[13]

37. From September 30, 2016, and continuing on in 2017 GEC was repeatedly advised by JDC that the failure to close out the General Contract and produce a working and properly permitted Microgrid exposed JDC to loss of tax credit financing and exposed GEC to Liquidated Damages. In order to mitigate damages for all concerned, on or about May 5, 2017, JDC and GEC agreed to close out the General Contract but that, *inter alia*, GEC would continue to provide all utility power to the Anna's Hope Project and would continue its efforts on the Anna's Hope Project until Alpha had in fact produced an acceptable properly permitted reliable Microgrid. A copy of this agreement (the "Closeout Letter Agreement") is attached as Exhibit P to the CSOF. GEC entered into this agreement based, *inter alia*, on continuing assurances from Alpha that Alpha could in fact perform the requirements of the Subcontract as amended.

38. As shown on Exhibit O, on the date the Closeout Letter Agreement was signed by GEC the Microgrid was supplying power to the Anna's Hope Project, but suffered a system failure on May 11, 2017. This was followed by repeated system failures until Alpha's final attempt in August of 2018 when the system failed for reasons unknown to GEC on August 24, 2018.

39. Among other items addressed in the Closeout Letter Agreement was the requirement that the Microgrid generator sets be properly permitted, not as "emergency generators" as required by GC CO-1 (see ¶ 26, above). Insofar as GC CO-1 was incorporated in the Subcontract, as amended, this obligation was owed by GEC to JDC and by Alpha to GEC.

40. As noted in ¶ 16, above, Alpha was required: "As a part of such performance the Subcontractor will timely provide all documentation required of Alpha and its constituents by Exhibit 1 to said change order during the shop drawing submittal process contemplated by Exhibit 1 and in this connection it shall provide written start up, commissioning, and long term operating performance standards for the Micro Grid system that are satisfactory to the Owner for the purposes of measuring the

---

[13] Deposition of Leonard Vega [75:11]–[75:21]; Deposition of Axel Schmidt [25:9]–[27:4]; Deposition of Jesse Krause [14:7]–[15:4]; Deposition of Danny Alldredge [23:4]–[25:20].

efficacy of the Micro Grid System after the physical installation of the Micro System under this Subcontract, satisfactory compliance with which shall be the exclusive responsibility of the Owner and the Subcontractor."

41. JDC hired Blue Oak Energy to work with Alpha to develop "written start up, commissioning, and long term operating performance standards for the Micro Grid system that are satisfactory to the Owner." According to the testimony of Danny Alldredge, Alpha's Project Manager, he has no recollection of any final written criteria having been approved by JDC.[14] No such written criteria were ever submitted by Alpha to GEC.

42. On or about June 21, 2018, GEC received from JDC a letter dated June 19, 2018, transmitting to GEC its written criteria for final commissioning of the Microgrid for further transmittal to Alpha. A copy of JDC's, letter, commissioning criteria, and GEC's email of transmittal to Alpha is attached as Exhibit Q to the CSOF. Alpha ultimately refused to commission the Microgrid using the protocol and criteria required by JDC.

43. On July 5, 2018, I received an email from Danny Alldredge (replying to an email string that commenced on March 5, 2018, relating to commissioning attempts generally) informing me that he was planning to come to St. Croix on July 23, 2018, to make repairs to the Microgrid inverter and to "begin the final verification of the system." A copy of his email is attached as Exhibit R to the CSOF.

44. Attached to Mr. Alldredge's email (Exhibit R) were newly issued permits for the generator sets that identified the generator engines as EPA Tier 3 but allowing "emergency use only." Copies of these generator permits (with highlighting added) are attached as Exhibit S to the CSOF.

45. On July 18, 2018, I forwarded Mr. Alldredge's email, together with the newly issued generator permits, to JDC. JDC responded via email the same day (with copies to Mr. Alldredge and Mr. Vega of Alpha) and instructed GEC as follows:

    1. The revised permit still doesn't address the issue that this isn't a stand by generator and can't be limited to 500 hours run time (x2) per year. The generators are an integral part of the entire microgrid and the necessary run time appears to exceed 1000 hours per year.

---

[14] Deposition of Danny Alldredge [182:7]-[184:8], [184:9]-[184:23], [187:9]-[189:12], [189:19]-[192:3].

    2. Alpha needs to comply with the commissioning requirements per the contract. If they won't or can't then they need to be terminated and you should file a bond claim.

    3. GEC is ultimately responsible for this system's functionality. I would suggest you give Alpha a deadline for compliance and if they fail, they should be terminated so you can step in to take the steps needed to complete the job.

A copy of JDC's return email is attached as Exhibit T to the CSOF.

46. As instructed by JDC, on July 18, 2018, GEC sent via email a demand for compliance to Alpha. This email demand is attached as Exhibit U to the CSOF.

47. No satisfactory response being received from Alpha, GEC terminated the Subcontract, as amended, by letter dated July 23, 2018, to be effective without further notice on July 30, 2018, in conformance with ¶ 23 of the Subcontract general conditions (see ¶ 16, above).[15] Two copies of the letter of termination are attached as Exhibit V to the CSOF.[16]

48. Notwithstanding termination of the Subcontract, at Alpha's specific request, JDC allowed Mr. Danny Alldredge access to the Anna's Hope Project for the purposes requested in his July 5, 2018, email. Mr. Alldredge arrived on site on or about July 24, 2018, and was given full access to the site. Mr. Alldredge did not inform GEC as to what work he was performing on the Microgrid.

49. At Mr. Alldredge's request the Anna's Hope Project was connected to the Microgrid on July 26, 2018. The system failed the next day and the Anna's Hope Project was returned to WAPA Power.[17]

50. At Mr. Alldredge's request the Anna's Hope Project was again connected to the Microgrid on August 10, 2018. Mr. Alldredge left the site on or after that date without notification to GEC of his departure. The Microgrid was left running and connected to the site. As of that date JDC had never accepted the Microgrid.

---

[15] ¶ 23 of the general conditions requiring no less than three days' notice.
[16] The termination letter was separately marked as an exhibit in the depositions of both Mr. Danny Alldredge (Exhibit 28) and Mr. Robert Lavitt (Exhibit 105). For clarity of reference to the deposition testimony, both copies are included in CSOF Exhibit V.
[17] Exhibit O to CSOF.

51. On August 16, 2018, GEC personnel observed an intermittent fault light blinking on the Microgrid inverter. It is not known if Mr. Alldredge was still on St. Croix at this time. This occurrence was documented by a video taken by a cell phone and later used as deposition Exhibit 33 in the deposition of Danny Alldredge. According to the testimony of Mr. Alldredge, the intermittent fault light indicated "[i]t's just saying something isn't doing what it thought it would do."[18]

52. On August 24, 2018, GEC personnel observe the same fault light on the Microgrid inverter lit solid red (i.e., not intermittent). This was also documented by a video taken by a cell phone and part of Exhibit 33 to Mr. Alldredge's deposition. Mr. Alldredge testified that the solid fault light indicated that "the inverter is in a faulted state." Mr. Alldredge also admitted that the Microgrid system had "an unanticipated cessation of operations on the 24th of August."[19]

53. When GEC personnel observed the solid fault light it was also observed that the generators were running the full site load and the batteries were not being charged. GEC then switched the Anna's Hope Project to WAPA power and manually shut down the Microgrid generators.

54. Attached to the CSOF as Exhibit W, and marked as Exhibit 34 to the deposition of Danny Alldredge, is a graph obtained from the Microgrid control system log for August 24, 2018. Mr. Alldredge testified that the data from deposition Exhibit 34 showed that the Microgrid batteries discharged to 5% capacity at about 2:00 a.m. and that the generators then ran without charging the batteries. Mr. Alldredge admitted that this was a "fault in the system."[20]

55. August 24, 2018, was the last date on which the Microgrid provided power to the Anna's Hope Project.

56. On or about August 21, 2018, as instructed by JDC, GEC made demand for performance of the Subcontract, as amended, upon Alpha's performance bonding company, Argonaut Insurance Company. A copy of the demand is attached as Exhibit X to the CSOF (also marked as Exhibit 106 to the deposition of Robert Lavitt).

57. I spoke with Mr. Lavitt on August 21, 2020, on the subject of the claim on the Argonaut performance bond. I followed up with an email to Mr. Lavitt on August 24, 2018, updating him on the status of the Microgrid, including its system failure on that date.

---

[18] Deposition of Danny Alldredge [248:1]-[252:1].
[19] Deposition of Danny Alldredge [248:1]-[252:1].
[20] Deposition of Danny Alldredge [252:22]-[254:2].

  Mr. Lavitt was informed in this email that the system had faulted and that GEC had shut down the diesel generators and switched the Anna's Hope Project to VIWAPA power. The .mov videos of the inverter fault lights referred to in ¶¶ 51 and 52, above, were attached to the August 24, 2018, email. A copy of this email is attached as Exhibit Y to the CSOF (also Exhibit 107 to the deposition of Robert Lavitt).

58. Following the conversation and follow-up email Mr. Lavitt requested the opportunity to send an "expert" to inspect the Microgrid. GEC promptly responded that the site would be made available to Argonaut inspection at any time. This request and GEC's response was documented by email which is attached as Exhibit Z to the CSOF (also Exhibit 108 to the deposition of Robert Lavitt).

59. In order to connect the Anna's Hope Project to the Microgrid GEC is required to provide 48 hours' notice to JDC so that the property manager and the tenants can be informed of possible power interruptions (switching from WAPA to the Microgrid or from the Microgrid to WAPA always involves a power interruption). Argonaut never informed GEC or any of its representatives that during any such inspection it desired to attempt to power Anna's Hope using the Microgrid.

60. Arrangements for the inspection were thereafter made between GEC's counsel and Mr. Frank Bigelis, trial counsel for Alpha. The inspection was scheduled for October 23 and 24, 2018. According to the testimony of Mr. Lavitt, Mr. Bigelis was also acting as counsel to Argonaut.[21]

61. The inspection occurred on October 23, 2018. Representing Argonaut and Alpha were Mr. Frank Bigelis, Mr. Danny Alldredge, and Mr. Lane Young (Argonaut's "expert"). During the inspection no attempt was made by the Argonaut/Alpha representatives to start the generators or power up the Microgrid, even though they were free to do so.

62. Argonaut denied the bond claim by letter dated November 19, 2018, a copy of which is attached as Exhibit AA to the CSOF (also Exhibit 111 to the deposition of Robert Lavitt). Specifically, Mr. Lavitt based Argonaut's denial on an alleged refusal by GEC counsel to allow connection of the Microgrid to the Anna's Hope Project, despite the fact that no such request had ever been made to GEC or to JDC and that Danny Alldredge of Alpha, who participated in the inspection, was aware of the need for prior notice to JDC.

---

[21] Deposition of Robert Lavitt, Exhibit KK to CSOF, [75:23]-[76:4].

63. GEC having invoked ¶ 23 of the Subcontract general conditions and terminated Alpha, and Argonaut having refused to complete the Subcontract under its performance bond, GEC has elected to undertake to complete and commission a working Microgrid to the satisfaction of JDC. In this connection, in early 2019 GEC retained S&C Electric Company to examine and report on the condition of the Microgrid. Attached to the CSOF as Exhibit BB is S&C's Site Assessment Report dated March 13, 2019 (without appendices, which have been produced to Alpha and Argonaut). The report notes a number of deficiencies in the design and engineering of the Microgrid.

64. GEC is currently engaged in negotiations with possible replacement subcontractors for the completion of a functioning Microgrid. In this connection GEC has already purchased a Tier 4 diesel generator of sufficient power to replace the illegal Tier 3 generators installed by Alpha.

65. In accordance with ¶ 23 of the Subcontract general conditions, if GEC's damages for Alpha's breach and costs of completion exceed the amounts remaining unpaid in the Subcontract value, as amended, Alpha will be liable to GEC for such excess.

66. In Alpha's SOF ¶ 11 it is stated that 2017 was GEC's most profitable year. That is true. However, GEC profits for 2017 cannot be attributed in any way to the Anna's Hope Project, which cost GEC much more money than was collected for the Anna's Hope Project in 2017 due to Alpha's default in delivering a working Microgrid as was required by the Subcontract, as amended. Rather, GEC made substantial profits in 2017 due to Hurricanes Irma and Maria and resulting emergency "blue roofing" contracts between GEC and the U.S. Army Corps of Engineers and hurricane debris removal contracts between GEC and the Government of the Virgin Islands.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2020, on St. Croix, Virgin Islands.

_____
John R. Wessel